# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-0095V

| | |
|---|---|
| COLLEEN HOLVECK, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: December 5, 2024 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Felicia Langel*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 31, 2022, Colleen Holveck filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on October 31, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

The parties were unable to resolve the matter on their own, and have instead fully briefed entitlement and damages (ECF Nos. 25, 28, 29). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and also award damages for actual pain and suffering in the amount of $100,000.00.

## I.     Factual Evidence

### A. Medical Records

Although I have reviewed the entire record, this decision summarizes only evidence relevant to entitlement and damages.

- On October 31, 2020, Petitioner received a flu vaccine in her left arm at Walgreen's Pharmacy in Avondale, PA.[3] Ex. 1 at 4-5.

- Three months later, on February 2, 2021, Petitioner saw her primary care physician, Dr. Stephen Kushner, complaining of "left breast throbbing and soreness [that] started 3 weeks ago" as well as pain in her left arm since receiving a flu vaccine on Halloween. Ex. 3 at 51. She stated that the vaccine "seemed to be done very high in arm," and she had experienced progressive pain in her arm since that time, which she rated as seven out of ten. *Id.* She also had left breast pain that "may/may not be related." *Id.* She struggled to lift her arm without pain. *Id.*

- On examination, Dr. Kushner noted no musculoskeletal deformities and that Petitioner's left breast was tender to palpation. Ex. 3 at 52. Left shoulder and chest x-rays were normal. Ex. 4 at 9. Petitioner was assessed with "clearly persist[e]nt pain and reduced rom [range of motion]," with Dr. Kushner noting that he planned to ask for an orthopedic opinion and that she may need physical therapy. Ex. 3 at 52.

- Petitioner went to the Deep Muscle Therapy and Skin Care Center on February 5, 2021, for trigger point therapy, and on February 15 and 23, 2021, for deep tissue massage. Ex. 11 at 8-10. She sought relief from left shoulder and arm pain from a flu vaccine received on Halloween. *Id.* at 6.

- On March 3, 2021, Petitioner saw orthopedist Dr. Damian Andrisani at Delaware Orthopedic Specialists. Ex. 3 at 49. Petitioner complained of pain in her left shoulder, with "[s]ymptoms start[ing] on 10/31/21[4] after receiving a flu shot." *Id.*

---

[3] Although nothing is circled in the "Site of Administration" column on the vaccine administration record, there is a handwritten letter "L" circled just above that. Ex. 1 at 5. Respondent does not contest that the vaccine was administered in Petitioner's left arm, and I find that it was so administered.

[4] Because this record pre-dates the recorded date of 10/31/21, I find that the year in this date is a typo and was meant to read 10/31/*20*.

- Her pain ranged from six to ten out of ten, and she described it as "stabbing burning throbbing aching." *Id.* She also complained of swelling, tingling, and stiffness, and stated that her symptoms interfered with lifting her arm overhead. *Id.* On examination, her left shoulder was tender about the bicipital groove, with range of motion ("ROM") of 140 degrees in forward flexion and 150 degrees in abduction. *Id.* at 50. Her left shoulder had full strength and negative impingement signs but a positive Speeds test. *Id.* Dr. Andrisani diagnosed Petitioner with adhesive capsulitis and pain of the left shoulder. *Id.* He recommended home exercises, activity modifications, and over the counter pain relievers. *Id.*

- Two months later (May 5, 2021), Petitioner returned to Dr. Andrisani for left shoulder and right elbow pain. Ex. 8 at 22. She complained of pain radiating down her arm as well as numbness and tingling, and rated her pain as seven to eight out of ten. Ex. 6 at 13. Her left shoulder ROM had worsened and was now 90 degrees in both forward flexion and abduction. Ex. 8 at 22. Dr. Andrisani determined that Petitioner was in the "freezing phase" of adhesive capsulitis, and administered a steroid injection into her glenohumeral joint due to continued pain and stiffness.[5] *Id.* at 23. Petitioner was advised to continue doing stretches at home. *Id.*

- On July 7, 2021, Petitioner returned to Dr. Andrisani for treatment of left shoulder pain. Ex. 8 at 19. Although she reported feeling better and that her symptoms had improved, she still complained of lack of mobility, and her pain rating and ROM were unchanged from her examination two months earlier *Id.* at 20. Dr. Andrisani noted that she remained in the "frozen phase" of adhesive capsulitis, and recommended that she continue with stretching at home. *Id.*

- On September 8, 2021, Petitioner followed up with Dr. Andrisani for left shoulder pain. Ex. 8 at 16. Petitioner continued to report a pain level of 8 out of 10. *Id.* On examination, her left shoulder ROM had improved slightly and was now 100 degrees in both forward flexion and abduction. *Id.* at 17. Dr. Andrisani recommended continued home stretching. *Id.*

- On November 17, 2021, Petitioner saw Dr. Andrisani for left shoulder pain that she rated as five out of ten. Ex. 8 at 12. On examination, her left shoulder ROM was unchanged from her examination two months prior. *Id.* at 13. Dr. Andrisani

---

[5] The record states that the injection was done in Petitioner's *right* shoulder. Ex. 8 at 23. However, the remainder of the record pertains to *left* shoulder pain and problems with Petitioner's right *elbow*. *Id.* The treatment for her right elbow was activity modification. *Id.* Respondent does not dispute that the injection was in Petitioner's left shoulder. Resp. at *3. I find that, more likely than not, the reference to a steroid injection in Petitioner's right shoulder is a typo, and that the injection was more likely administered in Petitioner's *left* shoulder.

discussed treatment options, and Petitioner elected to proceed with a left shoulder injection and manipulation under anesthesia. *Id.*

- On February 17, 2022, Dr. Andrisani performed an injection and manipulation under anesthesia on Petitioner's left shoulder. Ex. 8 at 10. The operative report listed her diagnosis as "left shoulder adhesive capsulitis refractory to conservative measures, ongoing following a flu shot on October 31, 2020." *Id.* Dr. Andrisani injected a combination of Depo-Medrol, Marcaine, and Lidocaine into Petitioner's left glenohumeral joint. *Id.* On examination, initially her ROM remained limited. *Id.* He was then able to achieve full ROM with "audible and palpable release of contracture." *Id.* There were no complications. *Id.* at 11.

- On the same day the aforementioned procedure was performed, Petitioner underwent a physical therapy evaluation of her left shoulder. Ex. 9 at 71. The record from this visit notes that her pain began following a 2020 vaccination, and that she had pain "about anterior chest and down arm." *Id.* Her pain was reported to be four out of ten at worst. *Id.* On examination, her left shoulder passive ROM was 180 degrees in flexion and scaption, 87 degrees in external rotation in the scapular plane, and 70 degrees in internal rotation in the scapular plain. *Id.* The therapist noted that she had full passive ROM, and would benefit from therapy to assist with active ROM and restore functional strength. *Id.*

- Between February 17 and March 30, 2022, Petitioner attended 19 physical therapy sessions at Rise Physical Therapy. Exs. 9, 10. At the last appointment documenting her ROM (March 1, 2022), her left shoulder active ROM was 138 degrees in flexion, 122 degrees in scaption, 80 degrees in external rotation, and 62 degrees in internal rotation. Ex. 9 at 29. On March 7, 2022, she reported that she was "feeling so much better." *Id.* at 16. On March 25, 2022, she said she was "doing really well." Ex. 10 at 12.

- On March 2, 2022, Petitioner saw Dr. Andrisani for a post-operative appointment. Ex. 8 at 6. She was feeling better and reported "minor pain" that she rated four out of ten, along with stiffness and tenderness in her nerves. *Id.* Her pain was gradually improving. *Id.* On examination, Petitioner was able to tolerate "gentle circumduction" and forward flexion of the shoulder. *Id.* at 7. Her left shoulder ROM was 160 degrees in forward flexion and abduction. *Id.* Dr. Andrisani recommended that Petitioner continue physical therapy two to three times a week for four to six weeks. *Id*

- On March 30, 2022, Petitioner returned to Dr. Andrisani. Ex. 8 at 3. Petitioner reported doing better since her last visit, yet rated her pain as eight out of ten (*higher* than at the prior visit, when she rated her pain as four out of ten). *Id.* She still had weakness and limited ROM in her shoulder, but felt physical therapy was

4

improving her symptoms. *Id.* On examination, her left shoulder ROM was 150 degrees in forward flexion and 180 degrees in abduction. *Id.* at 4.

No further treatment records have been filed.

### B. Declaration

Petitioner filed a declaration in support of her Petition.[6] Ex. 2. She states that when she received the vaccine, she observed that it had been administered high on her arm, and on the day of vaccination her arm "got extremely sore, more sore than I had ever experienced with a vaccine. *Id.* at ¶ 10. By Thanksgiving (about a month after vaccination), her pain had not gone away, and she was unable to carry her purse on that arm. *Id.* at ¶ 11. By Christmas, the pain had "escalated to a constant throbbing pain," preventing her from carrying boxes of holiday decorations. *Id.* Her sleep was interrupted, and the pain began to affect her work, requiring her to take rest breaks. *Id.*

In January, the pain was constant, and had spread to her entire left side and "down into [her] left breast." Ex. 2 at ¶ 12. She was unable to drive because her arm would go numb, or the pain prevented her from concentrating on the road. *Id.* She could not work out due to pain and difficulty of getting on and off her exercise bike. *Id.* She saw Dr. Kushner and asked for an orthopedic referral. *Id.* at ¶ 13. She could not get an orthopedic appointment for another month, so in the interim she sought massage therapy. *Id.* at ¶ 14. When she saw Dr. Andrisani in March, he told her that physical therapy would not help with her shoulder pain, at which she was "heartbroken." *Id.* at ¶ 15.

The cortisone injection she received helped, but did not provide long-term pain relief. Ex. 2 at ¶ 16. Petitioner states – in a declaration dated December 1, 2021, before her manipulation under anesthesia – that her quality of life has changed "dramatically," and she is "terrified" of what the rest of her life will look like. *Id.* at ¶ 17. She worries about the impact on her work performance, as well as the example she is setting for her child in going from active and happy to sedentary and sad. *Id.* at ¶ 19.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the

---

[6] Although Petitioner labeled Exhibit 2 as an affidavit, it is not notarized. Nonetheless, it is acceptable as a declaration because it complies with the requirements of 28 U.S.C. § 1746.

record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[7] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention*.*

Section 11(c)(1)(D).

---

[7] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

7

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

Petitioner argues that she has met the Table requirements for a SIRVA claim, as well as all statutory requirements, and is entitled to compensation. Petitioner's Motion for Ruling on the Record and Brief in Support of Damages, filed Oct. 20, 2023, at *10-20 (ECF No. 25) ("Mot."). Petitioner asserts that the record supports a finding that her shoulder pain began within 48 hours of vaccination. Mot. at *11. Petitioner emphasizes that she saw Dr. Kushner three months after vaccination for progressive pain in her left arm since her October 31st vaccination. *Id.* And she told her orthopedist that her symptoms started that same day, after a vaccination. *Id.* at *12. Her operative report notes that she had adhesive capsulitis "ongoing following a flu shot on October 31, 2020." *Id.* Petitioner's declaration testimony that her arm got "extremely sore" on the day of vaccination further supports a finding that the onset of her shoulder pain occurred within 48 hours of vaccination. *Id.*

With respect to the third QAI, Petitioner argues that Respondent incorrectly insists that a SIRVA claimant must have symptoms only in the vaccinated shoulder. Mot. at *13-15. Petitioner instead argues that the third QAI "requires symptoms of pain, and if there's reduced range of motion, to emanate from the shoulder that was vaccinated," such that a claim would be invalid if, for example, a petitioner had pain and decreased ROM *only* in their neck. *Id.* at *15. Petitioner cites *Rodgers v. Sec'y of Health & Human Servs.*, No.

18-0559V, 2021 WL 4772097 (Fed. Cl. Spec. Mstr. Sept. 9, 2021), for the proposition that the QAI language does not prevent a petitioner from satisfying the SIRVA Table requirements simply because they have unrelated pain in other areas of the body after the onset of SIRVA pain. *Id.* at *14-15.

Respondent argues that Petitioner has not established a SIRVA Table claim because she cannot prove by preponderant evidence that her pain began within 48 hours of vaccination or that her pain was limited to her left shoulder. Respondent's Rule 4(c) Report and Response, filed Dec. 29, 2023, at *6 (ECF No. 28) ("Resp."). Petitioner consistently described the onset of her left shoulder pain in vague terms, such as pain "after" or "following" her flu vaccination. Resp. at *6. Although she associated her left arm pain with vaccination, no medical records document that she reported her pain as having begun within 48 hours of vaccination. *Id.* And she delayed seeking care for over three months after vaccination, further undermining her onset assertions. *Id.*

In addition, although Petitioner states in her declaration that her pain started within 48 hours of vaccination, Respondent argues that I should not give the same weight to a declaration created for litigation well after the events in question that contradicts contemporaneous records. Resp. at *6. Respondent notes that there are discrepancies between unrelated statements in Petitioner's declaration and medical records, suggesting that "her recollection of events from October 2020 through February 2022, may not be accurate" and thus her declaration should be afforded little evidentiary weight. *Id.* at *6-7.

Respondent also contends that Petitioner is not entitled to compensation because her pain was not limited to the shoulder in which the vaccine was administered. Resp. at *7. When Petitioner first sought care, she complained not only of arm pain, but also of pain into her left breast and down her arm, noting that her left breast pain may or may not be related to her left arm pain. *Id.* And when she began physical therapy a year later, she reported pain about her anterior chest and down her left arm. *Id.* Petitioner's declaration also describes pain that "had spread to [Petitioner's] entire left side and down into [her] left breast." *Id.* (citing Ex. 2 at ¶ 12). *Rodgers* is not on point because from the "beginning to the end of her treatment for left shoulder pain, petitioner associated her shoulder pain with her chest and arm pain." *Id.* at *7-8. Respondent adds that nowhere do the records show that her shoulder, chest, and arm pain were *not* related, and no medical provider explained a separate reason for her chest and arm pain. *Id.* at *8.

Petitioner takes issue with Respondent's suggestion that a failure to specifically report onset - *within 48 hours* of that onset - defeats her claim. Petitioner's Reply Brief, filed Jan. 12, 2024, at *2 (ECF No. 29) ("Reply"). Petitioner argues that this "overly narrow" interpretation would preclude reliance on valid records that temporally connect a vaccination to an injury. *Id.* And it is illogical to expect a petitioner to state in black and white terms that their pain began within 48 hours; instead, a layperson would more logically be expected to report that their pain began after getting a vaccine, or that their

9

shoulder has been painful since the vaccine. *Id.* at *2-3 (citing *Plaza v. Sec'y of Health & Human Servs.*, No. 20-1717V, 2023 WL 6213277 (Fed. Cl. Spec. Mstr. Aug. 23, 2023); *Wyffels v. Sec'y of Health & Human Servs.*, No. 18-1874, 2021 WL 798834 (Fed. Cl. Spec. Mstr. Jan. 26, 2021); *Klausen v. Sec'y of Health & Human Servs.*, No. 19-1977V, 2021 WL 2808989 (Fed. Cl. Spec. Mstr. June 2, 2021); *Porcello v. Sec'y of Health & Human Servs.*, No. 17-1255V, 2020 WL 4725507 (Fed. Cl. Spec. Mstr. June 22, 2020)). Petitioner argues that the record supports a finding that her left shoulder pain began within 48 hours of vaccination. Reply at *3.

Petitioner disputes Respondent's contention that her pain radiating toward the side of her chest and arm disqualifies her claim. Reply at *4-5. Petitioner argues that the Vaccine Program has recognized that having unrelated conditions in other body parts does not prevent a petitioner from meeting the Table SIRVA requirements. *Id.* at *6 (citing *Robuck v. Sec'y of Health & Human Servs.*, No. 20-0465, 2023 WL 6214986 (Fed. Cl. Spec. Mstr. Aug. 21, 2023); *Rodgers*, 2021 WL 4772097; *Schmaltz v. Sec'y of Health & Human Servs.*, No. 21-47, 2023 WL 7104811 (Fed. Cl. Spec. Mstr. Sept. 22, 2023)). Petitioner further notes that Respondent presents two conflicting arguments – on the one hand, that the record does not show that Petitioner's chest and arm/shoulder pain were *not* related, but on the other hand, that Petitioner has not shown that all of her symptoms were SIRVA-associated. *Id.* at 6-7. Petitioner argues that unrelated symptoms would be a matter to address in damages, and should not defeat a finding of entitlement. *Id.* at *7.

Finally, Petitioner argues that there are no records indicating that Petitioner's pain radiated from her left breast area. Rather, the records always indicated that her pain originated *from the shoulder* in which the vaccine was administered. Reply at *7. As such, her pain can be found to be limited to her vaccinated shoulder, thereby meeting the third QAI requirement. *Id.* at *8.

### C. Factual Findings on Second and Third SIRVA QAI

After a thorough review of the entire record, I find that the evidence preponderantly supports a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination, and that she is not precluded from meeting the Table SIRVA requirements by her reported breast and chest symptoms.

First, I find onset is not defeated by Petitioner's initial treatment delay. As I have noted in other cases, it is not uncommon for SIRVA claimants to delay seeking care for their symptoms, hoping that the pain will resolve on its own. *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024); *Amor v. Sec'y of Health & Human Servs.*, 20-0978, 2024 WL 1071877, at *6 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021). A three-month delay in seeking care does not necessarily mean that the onset of a petitioner's pain was outside of the Table requirements if the records otherwise support a finding in the petitioner's

favor, although it may be relevant to damages (suggesting that the petitioner's symptoms were at least somewhat tolerable). And there is no requirement that a petitioner must specifically *report* to a medical provider that the onset of their pain was within 48 hours of vaccination (although in this case, Petitioner actually *did*, telling her orthopedist that her symptoms began on October 31st, the date of vaccination). Instead, for a case to be compensable, the records must *support* a finding that the pain began within 48 hours. *Brennan v. Sec'y of Health & Human Servs.*, No. 20-1844V, 2023 WL 7162365, at *7 (Fed. Cl. Spec. Mstr. Sept. 13, 2023).

Here, Petitioner sought care just over three months after vaccination, and thereafter persistently sought treatment. She consistently related her pain to her flu vaccination, and complained of pain since that time. Ex. 3 at 51; Ex. 9 at 71. She reported to her orthopedist that her symptoms started on October 31st – the day of vaccination. Ex. 3 at 49. I find that these records preponderantly support a finding that the onset of Petitioner's shoulder pain likely occurred on the date of vaccination. Petitioner's declaration also supports such a finding, although I do not place much reliance on it in reaching my conclusion. I do not find any contradiction between Petitioner's declaration stating that her pain began within 48 hours and contemporaneous records, as Respondent suggests. Petitioner's declaration supports, and is consistent with, the contemporaneous medical records. *See* Ex. 3 at 49 (March 3, 2021 orthopedist record noting that Petitioner's symptoms began on October 31st – the date of vaccination – after a flu vaccination).

Second, the record evidence of pain reported outside of Petitioner's shoulder does not defeat the third QAI Table element. Indisputably, Petitioner complained of breast and chest pain at several appointments when also she sought care for her left shoulder. But there is no evidence suggesting that her shoulder pain *originated from* her breast or chest. Instead, she described breast pain that "may/may not be related" to her shoulder pain (Ex. 3 at 51), and pain "about anterior chest and down arm." Ex. 9 at 71. Significantly, at her February 2, 2021 appointment with Dr. Kushner, she stated that the breast pain started three weeks earlier – which would mean in January – while she said her arm pain had been present since October. Ex. 3 at 51.

Thus, a preponderance of the evidence supports a finding that Petitioner's breast and chest pain are distinguishable from her left shoulder and arm pain. I have previously found that symptoms occurring outside of the vaccinated shoulder are not necessarily disqualifying if they are unrelated, or if the reported symptoms *primarily* occur in the vaccinated shoulder. *Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA); *Schmaltz*, 2023 WL 7104811, at *4-5 (noting that Petitioner's finger numbness may be unrelated to her SIRVA, and that the mere existence

11

of such complaints did not mean she could not meet the third QAI); *Robuck*, 2023 WL 6214986, at *6 (treatment to the petitioner's neck and back, in addition to shoulder, did not disqualify SIRVA claim where the record showed that the petitioner's shoulder was the focus of treatment, adding that unrelated treatment could be addressed in calculating damages); *Rodgers*, 2021 WL 4772097, at *8 (finding that unrelated wrist and finger pain did not disqualify a SIRVA claim). And preponderant evidence supports a finding that that Petitioner's shoulder symptoms most likely originated in her shoulder – and not her chest or breast.[8] As such, her breast and chest symptoms do not preclude a finding that Petitioner has met the third QAI (although because they are unrelated, she is not entitled to damages pertaining to them).

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain, or any other condition that would explain her post-vaccination symptoms. Ex. 3. She received a covered vaccine in the United States. Ex. 1 at 4-5. She experienced residual effects of her injury for more than six months. Ex. 8 at 22. And she states that neither she, nor any other party, has ever received an award or settlement for her vaccine-related injury or filed a civil action. Ex. 2 at ¶ 8.

I find that Petitioner has established by a preponderance of the evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

### III.  Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section V.A-B of *Fritz v. Sec'y of Health & Human Servs.*, No. 21-2086V, 2024 WL 4349581, at *6-8 (Fed. Cl. Spec. Mstr. Aug. 29, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y*

---

[8] I also note that Petitioner's treatment – cortisone injections, physical therapy, and manipulation under anesthesia – were aimed at her shoulder pain, not her breast or chest pain. After a chest x-ray was found to be normal, there was no further treatment or evaluation for her breast pain.

12

*of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[9]

### B. Parties' Arguments

Petitioner seeks a pain and suffering award of $105,000.00.[10] Mot. at *27. She cites *Selling*, *Bidlack*, *Randazzo*, and *Edwards*,[11] featuring pain and suffering awards of $105,000.00, $100,000.00, $125,000.00, and $173,000.00, respectively, in support of her claimed award. *Id.* at *24-27.

Petitioner views her case as most similar to *Selling* and *Bidlack*, in which the relevant petitioners also underwent manipulation under anesthesia rather than a more invasive surgical procedure. Mot. at *26. Petitioner asserts that she and the *Selling* and *Bidlack* petitioners also all had an initial delay in seeking treatment, followed by treatment with physical therapy, cortisone injections, and a manipulation under anesthesia.[12] *Id.* at *27. Ms. Holveck treated with 19 physical therapy sessions, compared to 18 for the *Selling* petitioner and 20 for the *Bidlack* petitioner. *Id.*

Respondent proposes a pain and suffering award of no more than $80,000.00. Resp. at *9. Respondent emphasizes that Petitioner's injury was moderate and limited in duration, and asserts that her three-month delay in seeking care is "strong evidence that her symptoms were likely mild during that time." *Id.* Thereafter, while Petitioner actively sought treatment, she was treated conservatively with over the counter pain medication, a cortisone injection, and home exercises. *Id.* at *9-10. During this time, she described her pain initially as six out of ten, then as improved but, somewhat inconsistently, as seven to eight out of ten, and finally five out of ten. *Id.* at *10. Her shoulder x-ray was negative, and she did not have an MRI. *Id.* Sixteen months after vaccination she underwent a

---

[9] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[10] On November 20, 2023, Petitioner filed a status report confirming that she seeks compensation only for pain and suffering, and does not have wage loss or out of pocket medical expenses (ECF No. 26).

[11] *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019); *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332 (Fed. Cl. Spec. Mstr. Mar. 6, 2023); *Randazzo v. Sec'y of Health & Human Servs.*, No. 18-1513V, 2021 WL 829572 (Fed. Cl. Spec. Mstr. Feb. 1, 2021); and *Edwards v. Sec'y of Health & Human Servs.*, No. 21-56V, 2023 WL 6847484 (Fed. Cl. Spec. Mstr. Sept. 11, 2023).

[12] Petitioner also asserts that the cases are alike in that the petitioners all underwent MRIs. Mot. at *27. However, the record does not support a finding that Ms. Holveck underwent an MRI. It also does not appear that the *Bidlack* petitioner had an MRI.

manipulation under anesthesia. *Id.* After 19 sessions of physical therapy over the next month and a half, she was discharged and did not seek further care. *Id.*

Respondent further argues that claimants consistently receive lower amounts for pain and suffering in mild to moderate SIRVA cases. Resp. at *10 (citing *Randazzo*, 2021 WL 829572, and *Bidlack*, 2023 WL 2885332). Petitioner's SIRVA was similarly moderate. She delayed seeking treatment for over three months, her reduced ROM was not described as severe, the degree of her shoulder pathology is unknown, she had two cortisone injections (one under anesthesia), attended physical therapy for a month, and had a non-invasive manipulation under anesthesia. *Id.* Respondent distinguishes Petitioner's cases as involving less severe injuries, with *Bidlack* being the most similar. *Id.* at *11-12. However, Respondent argues that Ms. Holveck's lengthy delay in seeking care and rapid improvement with physical therapy after her shoulder manipulation make this case significantly less severe, warranting a reduced award of no more than $80,000.00. *Id.* at *12.

Petitioner notes in her reply that Respondent has not offered any comparable cases of his own in support of his proposed pain and suffering sum.[13] Reply at *8. Petitioner reiterates that the amount of treatment and treatment paths of the petitioners in *Selling* and *Bidlack* are "extremely similar" to that of Petitioner, with all three undergoing two cortisone injections, similar amounts of physical therapy, and a manipulation under anesthesia without a more invasive surgical procedure. *Id.* at *14. Although Ms. Holveck waited slightly longer to seek treatment, she argues that she treated for longer than the other petitioners.[14] *Id.*

### C. Appropriate Compensation for Pain and Suffering

I find that Petitioner suffered from a moderate SIRVA that continued for 17 months. When she stopped seeking care, her pain levels and ROM had improved.[15]

---

[13] Petitioner adds that the amount proposed by Respondent "was never formally offered to Petitioner during settlement discussions" and asks that the court not presume that Petitioner was presented with, and declined, this offer. Reply at *8 n.1.

[14] Although Petitioner asserts her injury continued for 18 months, I find that it was 17 months – not a significant difference. However, I do not agree with Petitioner that the *Selling* petitioner's injury duration was ten months. The special master in *Selling* stated that the petitioner "was not totally pain-free until the beginning to middle of 2017" – which is roughly two and a half years after vaccination – far beyond the ten months Petitioner claims. *Selling*, 2019 WL 3425224, at *6. I do agree that Ms. Holveck's injury duration was longer than that of the *Bidlack* petitioner (13 months).

[15] The record of her last orthopedic visit documents a pain level of eight out of ten, compared to four out of ten less than a month earlier. Ex. 8 at 3, 6. This seems anomalous, and is difficult to square with contemporaneous physical therapy records documenting that she was "feeling so much better" and "doing really well." Ex. 9 at 16; Ex. 10 at 12. The best reading of these records is that the eight out of ten pain rating at Petitioner's last orthopedic visit was either a typo, or that Petitioner had experienced a transient worsening of her pain that abated soon thereafter.

I find that this case is most similar to *Bidlack*. Both Ms. Holveck and the *Bidlack* petitioner underwent a manipulation under anesthesia, received two cortisone injections, and engaged in similar amounts of physical therapy. Although Ms. Holveck's injury continued for approximately four months longer than that of the *Bidlack* petitioner, Ms. Holveck also delayed seeking care for significantly longer (three months for Ms. Holveck, compared to *Bidlack,* where the petitioner sought treatment just nine days after vaccination, and was seen a month later) – suggesting that during this time, Ms. Holveck's symptoms were manageable without professional medical care, and not as severe as those of the *Bidlack* petitioner.

*Selling* also has similarities, but involved a longer duration (approximately 30 months) and greater impact, including exacerbation of the petitioner's pre-existing anxiety and depression. Additionally, although the *Selling* petitioner did not seek care immediately, he sought care at two months, rather than three as here.

*Edwards* bears few similarities to this case. That case involved a petitioner who sought care just two weeks after vaccination, and ultimately underwent two separate procedures, including both a manipulation under anesthesia *and* arthroscopic surgery, in addition to far more physical therapy than Ms. Holveck. *Randazzo* is also not a good comparable, involving a petitioner who underwent arthroscopic surgery – which is more invasive than the manipulation Petitioner had – and also sought care just three weeks after vaccination – suggesting greater pain.

Taking all of the above into account, I deem an award of $100,000.00 fair compensation for Petitioner's actual pain and suffering.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I award Petitioner a lump sum payment of $100,000.00, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

---

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
